Abigail P. Barnes (Bar No. 313809)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
Telephone: +1 (415) 591-6000
Facsimile: +1 (415) 591-6091
Email: abarnes@cov.com

Trisha B. Anderson*
David M. Zionts*
Alexander N. Ely*
Diana Lee*
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: +1 (202) 662-6000
Facsimile: +1 (202) 662-6291
Email: tanderson@cov.com, dzionts@cov.com,
aely@cov.com, dlee@cov.com

Scarlet Kim*
Dror Ladin*
Hina Shamsi*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: +1 (212) 549-2660
Email: scarletk@aclu.org, dladin@aclu.org,
hshamsi@aclu.org

*Application for admission* pro hac vice
*forthcoming*

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEILA N. SADAT; K. ALEXA KOENIG; NAOMI ROHT-ARRIAZA; and STEVEN M. WATT, | Civil Case No.: |
| *Plaintiffs*, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF STATE; MICHAEL R. POMPEO, in his official capacity as Secretary of State; U.S. DEPARTMENT OF THE TREASURY; STEVEN T. MNUCHIN, in his official capacity as Secretary of the Treasury; U.S. DEPARTMENT OF JUSTICE; JEFFREY A. ROSEN, in his official capacity as Acting Attorney General; OFFICE OF FOREIGN ASSETS CONTROL; and ANDREA M. GACKI, in her official capacity as Director of the Office of Foreign Assets Control, | |
| *Defendants*. | |

Plaintiffs Leila N. Sadat; K. Alexa Koenig; Naomi Roht-Arriaza; and Steven M. Watt (collectively, "Plaintiffs"), by and through their attorneys, file this complaint for declaratory and injunctive relief against Defendants Donald J. Trump, in his official capacity as President of the United States; the U.S. Department of State; Michael R. Pompeo, in his official capacity as Secretary of State; the U.S. Department of the Treasury; Steven T. Mnuchin, in his official capacity as Secretary of the Treasury; the U.S. Department of Justice; Jeffrey A. Rosen, in his official capacity as Acting Attorney General; the Office of Foreign Assets Control; and Andrea M. Gacki, in her official capacity as Director of the Office of Foreign Assets Control (collectively, "Defendants"); and allege upon information and belief as follows:

## INTRODUCTION

1.     Plaintiffs are three distinguished law faculty and a human rights attorney who work with or advocate before the International Criminal Court ("ICC"), and specifically its Office of the Prosecutor ("OTP"), on human rights and humanitarian law matters. Plaintiffs file this suit to challenge the Trump administration's unprecedented imposition of sanctions against two senior OTP officials, which violate Plaintiffs' First Amendment rights by prohibiting their constitutionally protected speech with the OTP.

2.     The ICC is a permanent court based in The Hague, The Netherlands. The international community joined together to establish the ICC in 1998 in order to hold accountable perpetrators of genocide, war crimes, and crimes against humanity (collectively known as "atrocity crimes"). The establishment of the ICC reflects a shared international understanding that global peace, security, and well-being require an international, independent court of last resort able to ensure accountability for these most serious crimes when national justice systems are unable or unwilling to do so.

3.     The effort to provide an avenue for justice for atrocity crimes and other serious violations of international human rights and humanitarian law is a legacy of the post-World War II trials at the International Military Tribunal at Nuremberg. The ICC has enjoyed broad international support since its founding: 120 States initially adopted the Rome Statute of the International Criminal Court (the "Rome Statute") creating the ICC and, as of today, 123 States Parties have ratified or acceded to it. Unlike many of its allies, the United States is not among them: The United States signed the Rome Statute in 2000, but has not ratified the treaty. Nevertheless, both Democratic and Republican administrations have supported

the ICC's critical work on matters including the recruitment of child soldiers in the Democratic Republic of the Congo, the genocide in Darfur, and the Gaddafi regime's attacks on civilians in Libya. The United States has issued statements commending the ICC's work, supported referrals to the ICC by the United Nations Security Council, and even facilitated the transfer of alleged perpetrators to ICC custody.

4.      On June 11, 2020, in a marked departure from the United States' past posture towards the ICC, President Trump declared a national emergency with respect to "any attempt by the ICC to investigate, arrest, detain, or prosecute any United States personnel without the consent of the United States, or of personnel of countries that are United States allies and who are not parties to the Rome Statute or have not otherwise consented to ICC jurisdiction" and delegated to the Secretary of State responsibility for designating foreign persons involved in the ICC's efforts to investigate, arrest, detain, or prosecute U.S. or allied personnel. Exec. Order No. 13,928, *Blocking Property of Certain Persons Associated With the International Criminal Court*, 85 Fed. Reg. 36,139 (June 15, 2020) (the "Executive Order"). On September 2, 2020, Secretary of State Pompeo designated the Prosecutor of the ICC and another top ICC official, and the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") added them to its List of Specially Designated Nationals and Blocked Persons ("SDN List"). The United States has never before imposed sanctions against officials pursuing justice at an international court or body.

5.      Plaintiffs have each previously provided substantial assistance to the OTP's investigations and prosecutions of atrocity crimes. The Executive Order and implementing steps taken by the U.S. government have forced Plaintiffs, under the threat of civil and criminal penalties, to stop providing, among other services, legal advice, trainings, and evidence of atrocity crimes to the OTP, and to stop representing victims of atrocity crimes in ICC proceedings. Plaintiffs are just a few of the many U.S. persons who would otherwise support the OTP's important work, and have done so in the past, but are now prohibited from doing so.

6.      Prohibiting Plaintiffs and others like them from assisting the OTP is unconstitutional and unlawful. The Executive Order and implementing steps taken by the U.S. government violate the First Amendment by prohibiting Plaintiffs from engaging in constitutionally protected speech activities with or in support of the OTP. They are also *ultra vires*, in violation of the International Emergency Economic

Powers Act ("IEEPA"), 50 U.S.C. §§ 1701–1706, the asserted statutory basis for the Executive Order, and the implementing steps violate the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), (C), because they purport to prohibit Plaintiffs from transferring or receiving information or informational materials from the OTP. Plaintiffs seek a declaration invalidating the Executive Order and its implementation, and an order enjoining Defendants from implementing or enforcing the Executive Order and from enforcing IEEPA's civil or criminal penalty provisions against Plaintiffs.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the United States Constitution, IEEPA, and the APA.

8.      This Court has authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, and injunctive relief pursuant to 5 U.S.C. § 702 and the Court's inherent equitable powers.

9.      Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because officers or employees of agencies of the United States acting in their official capacities and agencies of the United States are defendants and because Plaintiffs Koenig and Roht-Arriaza reside in this district. 28 U.S.C. § 1391(e)(1)(C).

## INTRA-DISTRICT ASSIGNMENT

10.     Pursuant to Civil Local Rule 3-2(c) and (d), this case should be assigned to the San Francisco Division or Oakland Division.

## PARTIES

**I.        Plaintiffs**

11.     Plaintiff Leila N. Sadat is the James Carr Professor of International Criminal Law and Director of the Crimes Against Humanity Initiative at Washington University in St. Louis School of Law. She also served for thirteen years as Director of the Whitney R. Harris World Law Institute. In 2012, the Prosecutor of the ICC appointed Plaintiff Sadat as Special Adviser on Crimes Against Humanity to the Prosecutor. Plaintiff Sadat resides in Missouri and is a citizen of the United States.

12.     Plaintiff K. Alexa Koenig is a Lecturer in Residence and the Executive Director of the Human Rights Center at the University of California, Berkeley School of Law. Since 2016, Plaintiff Koenig has served as co-chair of the OTP's Technology Advisory Board. Plaintiff Koenig resides in California and is a citizen of the United States.

13.     Plaintiff Naomi Roht-Arriaza is a Distinguished Professor of Law at the University of California, Hastings College of the Law. Plaintiff Roht-Arriaza resides in California and is a citizen of the United States.

14.     Plaintiff Steven M. Watt is a Senior Staff Attorney with the Human Rights Program at the American Civil Liberties Union ("ACLU"). Plaintiff Watt resides in New York and is a citizen of the United States and the United Kingdom.

**II.     Defendants**

15.     Defendant Donald J. Trump is the President of the United States. President Trump issued the Executive Order, purportedly acting under authority of IEEPA. Plaintiffs sue President Trump in his official capacity.

16.     Defendant the Department of State is a United States agency headquartered in Washington, D.C.

17.     Defendant Michael R. Pompeo is the United States Secretary of State. Plaintiffs sue Defendant Pompeo in his official capacity. The Secretary of State is tasked under the Executive Order with determining whether "any foreign person" has "(A) . . . directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute any United States personnel without the consent of the United States; (B) . . . directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute any personnel of a country that is an ally of the United States without the consent of that country's government; (C) . . . materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, any activity described in subsection (a)(i)(A) or (a)(i)(B) of this section or any person whose property and interests in property are blocked pursuant to this order; or (D) [is] owned or controlled by, or . . . acted or purported to act for or on behalf of, directly or indirectly, any person whose property and interests in property are blocked pursuant to this order." Exec. Order § 1(a)(i).

18.     Defendant the Department of the Treasury is a United States agency headquartered in Washington, D.C. The Department of the Treasury is charged with implementing the President's IEEPA authorities under the Executive Order.

19.     Defendant Steven T. Mnuchin is the United States Secretary of the Treasury. Plaintiffs sue Defendant Mnuchin in his official capacity.

20.     Defendant the Department of Justice ("DOJ") is a United States agency headquartered in Washington, D.C. DOJ is responsible for criminal enforcement of violations of IEEPA, including violations of the prohibitions in the Executive Order.

21.     Defendant Jeffrey A. Rosen is the United States Acting Attorney General. Plaintiffs sue Defendant Rosen in his official capacity.

22.     Defendant OFAC is an office within the Department of the Treasury located in Washington, D.C. OFAC is responsible for civil enforcement of violations of IEEPA, including violations of the prohibitions in the Executive Order. On September 2, 2020, OFAC added the Prosecutor of the ICC, Ms. Fatou Bensouda, and the Director of the OTP's Jurisdiction, Complementary, and Cooperation Division, Mr. Phakiso Mochochoko, to the SDN List (the "Designations"). On September 30, 2020, OFAC issued regulations implementing the Executive Order (the "Regulations"). 31 C.F.R. pt. 520.

23.     Defendant Andrea M. Gacki is the Director of OFAC. Plaintiffs sue Defendant Gacki in her official capacity.

## FACTUAL ALLEGATIONS

### I.     The International Criminal Court and the Office of the Prosecutor

#### A.     The Jurisdiction of the ICC

24.     The ICC may exercise jurisdiction over investigations, prosecutions, and punishment of individuals accused of atrocity crimes. A State that ratifies or accedes to the Rome Statute consents to ICC jurisdiction over such crimes allegedly committed on or after July 1, 2002 in the State's territory or by its nationals, and may refer crimes within the ICC's jurisdiction to the ICC.

25.     The ICC's mandate to hold accountable perpetrators of atrocity crimes is limited by respect for national sovereignty. The court does not assert jurisdiction over crimes that are adequately addressed

by national criminal justice systems. Under Article 1 of the Rome Statute, the ICC's jurisdiction is "complementary to national criminal jurisdictions." This principle of complementarity ensures that the ICC remains a court of last resort rather than replacing national justice systems.

26.     The Rome Statute also allows the ICC to exercise jurisdiction over crimes referred to the ICC Prosecutor by the United Nations Security Council under Chapter VII of the Charter of the United Nations, which, as relevant here, authorizes the Security Council to take measures to "maintain or restore international peace and security" after identifying "any threat to the peace, breach of the peace, or act of aggression." The United States is a permanent member of the United Nations Security Council.

**B.     The Stages of ICC Proceedings**

27.     Matters before the ICC proceed in several stages: (1) the preliminary examination stage, involving an initial assessment of various preconditions to a formal investigation, including jurisdictional criteria, evidentiary sufficiency, the gravity of the alleged crimes, and the interests of justice and victims; (2) the formal investigation stage, involving evidence-gathering, identification of possible suspects, and the issuance of arrest warrants or summonses to appear; (3) the pre-trial stage, involving a determination by the ICC judges of whether there is sufficient cause to take the case to trial; (4) the trial stage, requiring proof of guilt beyond a reasonable doubt before the ICC judges may convict and impose a sentence and/or order reparations for victims; (5) the appeals stage; and (6) the enforcement of any sentence in a country that has agreed to enforce ICC sentences.

28.     The OTP is an independent organ of the ICC. It consists of three main Divisions: (1) the Jurisdiction, Complementarity and Cooperation Division, which conducts preliminary examinations of "situations" (that is, matters involving alleged crimes within the ICC's jurisdiction); (2) the Investigation Division, which conducts formal investigations of the alleged crimes associated with those situations; and (3) the Prosecution Division, which prepares litigation strategies and prosecutes the allegedly responsible individuals before the ICC's judges. Each Division reports to the Prosecutor and the Deputy Prosecutor.

29.     The Prosecutor of the ICC heads the OTP, which is staffed by approximately 380 people from around the world.

30.     Ms. Fatou Bensouda serves as Prosecutor of the ICC. The Assembly of States Parties elected Ms. Bensouda to this role by consensus in 2011, and she has served as Prosecutor since 2012.

31.     Mr. Phakiso Mochochoko serves as Director of the Jurisdiction, Complementarity and Cooperation Division. He has served in this role since 2011.

32.     Article 42(2) of the Rome Statute gives the Prosecutor full authority over OTP operations, and Article 54(1)(b) gives her the power and duty to "[t]ake appropriate measures to ensure the effective investigation and prosecution of crimes" within the ICC's jurisdiction. The Prosecutor may initiate investigation of a situation referred by a State Party or the United Nations Security Council following the preliminary examination stage. The Prosecutor may also request authorization from the ICC's Pre-Trial Chamber to initiate an investigation following the preliminary examination stage under Article 15 of the Rome Statute, based on information of crimes within the ICC's jurisdiction and without a referral from a State Party or the United Nations Security Council.

33.     During the preliminary examination stage, the OTP assesses the preconditions specified in the Rome Statute for initiating or requesting a formal investigation. The OTP must assess, *inter alia*, whether there is a reasonable basis to believe that a crime within the ICC's jurisdiction has been committed; the alleged crimes were committed on or after July 1, 2002; the alleged crimes were committed in the territory of a State Party or by nationals of a State Party; the gravity of the alleged crimes is sufficient to warrant ICC involvement; and opening an investigation would serve the interests of justice and the victims. The OTP must also make a complementarity determination—because national authorities bear primary responsibility for investigating and prosecuting the crimes within the ICC's jurisdiction, the OTP may initiate or request a formal investigation only when "national authorities have failed to uphold this primary responsibility" and "there are no genuine investigations or prosecutions for the same crimes at the national level."[1]

34.     When the Prosecutor seeks to initiate a formal investigation without a referral from a State Party or the United Nations Security Council under Article 15 of the Rome Statute, she must request

---

[1] *See Office of the Prosecutor*, Int'l Crim. Ct., https://www.icc-cpi.int/about/otp (last visited Jan. 14, 2021).

authorization from the judges of the ICC's Pre-Trial Chamber. The Pre-Trial Chamber must verify that the Rome Statute's preconditions to an investigation are satisfied and that there is a reasonable basis to proceed to a formal investigation. The Pre-Trial Chamber has the power to reject the Prosecutor's request to initiate an investigation.

35.    Likewise, certain decisions by the Prosecutor not to initiate an investigation of a situation referred by a State Party or the United Nations Security Council are reviewable by the Pre-Trial Chamber under Article 53(3) of the Rome Statute. The referrer may request the Pre-Trial Chamber to conduct such a review, and after review, the Pre-Trial Chamber may request that the Prosecutor reconsider her decision not to open a formal investigation. If the Prosecutor's decision rests solely on a conclusion that an investigation would not be in the interests of justice, the Pre-Trial Chamber may initiate its own review, and it must confirm the Prosecutor's decision for that decision to be effective.

36.    In the investigation stage, the OTP often sends missions composed of investigators, cooperation advisers, and prosecutors to relevant countries with their consent to collect evidence of alleged crimes.

### C.    The Work of the ICC and the OTP

37.    In conducting preliminary examinations, investigations, and prosecutions, the OTP seeks and obtains information and assistance from a range of state and non-state actors and individuals: States Parties and non-States Parties, international and regional organizations, formal and informal advisers to the OTP, and members of civil society, such as law professors, law school clinics, and victims and their legal representatives. Under Article 42(1) of the Rome Statute, the OTP (and ultimately the Prosecutor) is responsible for conducting all preliminary examinations, investigations, and prosecutions.

38.    Article 42(9) of the Rome Statute provides that the "Prosecutor shall appoint advisers"— known as Special Advisers—"with legal expertise on specific issues, including, but not limited to, sexual and gender violence and violence against children." Special Advisers have "recognized expertise in their field" and "provide advice to the Prosecutor at her request or on their own initiative on training, policies, procedures and legal submissions. They work on a pro-bono basis and . . . are required to sign a confidentiality agreement."

39.     Victims of crimes within the ICC's jurisdiction, as well as their representatives, play an active role at all stages of ICC proceedings. Victims and their representatives frequently provide the OTP with information and evidence during the preliminary examination and formal investigation phases. In the course of preliminary examinations, the OTP, in performing its evidence-gathering function, may also contact potential victims through their legal representatives. Civil society groups may also submit evidence to the OTP regarding situations that are under, or are being considered for, preliminary examination.

40.     Moreover, under Article 15(3) of the Rome Statute and Rule 50(3) of the ICC's Rules of Procedure and Evidence, victims may, of their own accord or in response to a request by the Prosecutor, make written representations to the ICC's Pre-Trial Chamber regarding an Article 15 request by the Prosecutor for the Chamber's authorization to open a formal investigation. Likewise, under Article 68(3) of the Rome Statute and Rules 89 and 91 of the Rules of Procedure and Evidence, victims may actively present their views and concerns to the ICC's judges during judicial proceedings, including through legal representatives who are independent of the OTP. Victims and their representatives may apply for victim status to participate in ICC judicial proceedings by submitting appropriate documentation to the ICC's Victims Participation and Reparations Section (the "Victims Section"), a unit of the ICC's Registry organ that works closely with the OTP.

41.     The ICC's judges have authority to issue arrest warrants at the request of the OTP, but the ICC lacks independent enforcement power, and thus relies upon States Parties to enforce its warrants. Non-States Parties, including the United States, have also provided critical assistance in facilitating the transfer of suspects to ICC custody. To date, the ICC has issued thirty-five arrest warrants, resulting in seventeen pre-trial detentions, and has convicted eight individuals.

42.     Although the United States has declined to ratify the Rome Statute (despite signing the treaty in 2000), both Democratic and Republican administrations have supported several prominent ICC investigations and prosecutions, including the following:

a.      *Democratic Republic of the Congo*: In April 2004, the Democratic Republic of the Congo referred to the ICC war crimes and crimes against humanity—including

rape, murder, and the use of child soldiers—allegedly committed during an armed conflict in its territory since July 2002. The OTP opened an investigation into these crimes in June 2004. The investigation led to charges against Bosco Ntaganda, a militia commander, among other individuals. In March 2013, Ntaganda surrendered to the U.S. Embassy in Rwanda, and the United States facilitated his transfer to ICC custody. At the time, the "United States welcome[d] the removal of one of the most notorious and brutal rebels in the Democratic Republic of the Congo, Bosco Ntaganda, . . . to the International Criminal Court."[2] In November 2013, the United States Ambassador-at-Large for War Crimes Issues commended the United States' "key role in the surrender of Bosco Ntaganda to the ICC."[3] In July 2019, the Trial Chamber of the ICC found Ntaganda guilty of five counts of crimes against humanity and thirteen counts of war crimes, including offenses such as intentionally directing attacks against civilians, ordering the displacement of the civilian population, and conscripting and enlisting children under the age of fifteen years into an armed group and using them to participate actively in hostilities. In November 2019, the Trial Chamber sentenced him to thirty years in prison.

b.   *Uganda*: In January 2004, Uganda referred to the ICC war crimes and crimes against humanity—including rape and murder—allegedly committed during an armed conflict in its territory since July 2002. The OTP opened an investigation into these crimes in July 2004. The investigation has led to five ICC arrest warrants. U.S. forces captured one defendant, Dominic Ongwen, in the Central African Republic in 2015 and facilitated his transfer to Ugandan and Central African

---

[2] Press Statement, U.S. Dep't of State, Bosco Ntaganda's Expected Surrender to the International Criminal Court (Mar. 22, 2013), https://2009-2017.state.gov/secretary/remarks/2013/03/206556.htm.

[3] Remarks, Ambassador-at-Large for War Crimes Issues, Office of Glob. Crim. Just., Statement of the U.S. at the Twelfth Session of the Assembly of States Parties of the International Criminal Court (Nov. 21, 2013), https://2009-2017.state.gov/j/gcj/us_releases/remarks/2013/218069.htm.

Republic forces for transfer to ICC custody. The U.S. Department of State "welcome[d] the transfer of Dominic Ongwen by Central African authorities to the International Criminal Court," calling it "a welcome step toward justice for the victims of the Lord's Resistance Army."[4]

c.   *Central African Republic*: In December 2004, the Central African Republic referred to the ICC war crimes and crimes against humanity—including mass rapes and killings—allegedly committed during an armed conflict in its territory in 2002 and 2003. The OTP opened an investigation into these crimes in May 2007. In May 2014, the Central African Republic referred to the ICC additional war crimes and crimes against humanity—including rape, murder, and the use of child soldiers—allegedly committed during an armed conflict in its territory since August 2012. The OTP opened an investigation into these crimes in September 2014. In March 2016, the U.S. Department of State indicated that "[t]he United States supports the ICC's investigations in the Central African Republic, and we commend [the Central African Republic]'s commitment to ensuring accountability for serious crimes, including through its cooperation with the ICC in this matter."[5]

d.   *Darfur, Sudan*: In March 2005, the United Nations Security Council referred to the ICC the situation in the Darfur region of Sudan. In June 2005, the OTP opened an investigation into crimes allegedly committed in Darfur since July 2002, including genocide, war crimes, and crimes against humanity. Although the United States holds a unilateral veto as a permanent Security Council member, President George W. Bush's administration abstained from the vote referring the Darfur situation to the ICC, thereby allowing the referral to proceed. A March 2005 Security Council

---

[4] Press Statement, U.S. Dep't of State, Transfer of Dominic Ongwen to the International Criminal Court (Jan. 20, 2015), https://2009-2017.state.gov/r/pa/prs/ps/2015/01/236142.htm.

[5] Press Statement, U.S. Dep't of State, ICC Convicts Jean-Pierre Bemba Gombo of War Crimes and Crimes Against Humanity (Mar. 22, 2016), https://2009-2017.state.gov/r/pa/prs/ps/2016/03/254958.htm.

press release reported that the Acting U.S. Permanent Representative to the United Nations said the United States "strongly supported bringing to justice those responsible for the crimes and atrocities that had occurred in Darfur and ending the climate of impunity there."[6] Likewise, in a February 2007 press conference, the U.S. Department of State stated that the United States "fully support[s] bringing to justice those responsible for crimes and atrocities that occurred . . . in Darfur. . . . [W]e would call upon the Sudanese Government to cooperate fully with the ICC under the aegis of UN Security Council Resolution 1593. . . . [I]t is now incumbent upon the Government of Sudan, we believe, to cooperate with the ICC."[7]

e.    *Libya*: In February 2011, the United Nations Security Council referred to the ICC the situation in Libya, which included widespread and systematic attacks on civilians. In March 2011, the OTP opened an investigation into crimes allegedly committed in Libya since February 2011, including murder, torture, and persecution. The United States voted for the referral. The U.S. Permanent Representative to the United Nations explained at the time of the vote that "the Security Council has responded to the Libyan people's cry for help. This Council's purpose is clear: to protect innocent civilians. On February 26, . . . the Security Council demanded a halt to the violence in Libya and enabled genuine accountability for war crimes and crimes against humanity by referring the situation to the International Criminal Court."[8] According to a May 2011 Security Council press release, the Ambassador said the Security Council's referral "reflect[ed] the

---

[6] Press Release, Security Council, Security Council Refers Situation in Darfur, Sudan, to Prosecutor of International Criminal Court, U.N. Press Release SC/8351 (Mar. 31, 2005), https://www.un.org/press/en/2005/sc8351.doc.htm.

[7] Daily Press Briefing, U.S. Dep't of State (Feb. 27, 2007), https://2001-2009.state.gov/r/pa/prs/dpb/2007/feb/81127.htm.

[8] Remarks, U.S. Permanent Representative to the United Nations, Explanation of Vote on UN Security Council Resolution 1973, Libya (Mar. 17, 2011), https://2009-2017.state.gov/p/io/rm/2011/158576.htm.

importance the international community attached to ensuring that those responsible for widespread attacks against innocent civilians in Libya were held responsible."[9]

f.   *Mali*: In July 2012, Mali referred to the ICC war crimes—including deliberate destruction of Muslim shrines in the city of Timbuktu—allegedly committed during an armed conflict in its territory since January 2012. The OTP opened an investigation into these crimes in January 2013. The U.S. Department of State "welcome[d] the announcement by the Prosecutor of the International Criminal Court . . . that Ahmad Al Faqi Al Mahdi, an alleged member of the Islamic extremist group Ansar al-Dine . . . , has been surrendered to the Court by Nigerien authorities," called the surrender "an important step toward holding accountable those responsible for serious crimes in Mali," and commended "Mali's commitment to ensuring accountability for serious crimes and its cooperation with the ICC in this matter."[10]

**D.   The OTP's Palestine and Afghanistan Investigations**

43.   In May 2018, the State of Palestine referred to the ICC alleged crimes committed in Palestinian territory since June 2014. In December 2019, Ms. Bensouda found that the Rome Statute criteria for opening an investigation had been met. However, in light of "unique and highly contested legal and factual issues" regarding "the territory within which the investigation may be conducted," Ms. Bensouda sought a ruling from the Pre-Trial Chamber under Article 19(3) of the Rome Statute confirming whether that territory includes the West Bank (including East Jerusalem) and Gaza before the OTP takes the "appropriate next steps."[11] The Pre-Trial Chamber has not ruled as of the filing of this complaint.

---

[9] Press Release, Security Council, Chief Prosecutor of International Criminal Court Tells Security Council He Will Seek Arrest Warrants Soon Against Three Individuals in First Libya Case, U.N. Press Release SC/10241 (May 4, 2011), https://www.un.org/press/en/2011/sc10241.doc.htm.

[10] Press Statement, U.S. Dep't of State, ICC Announces Case on Destruction of Cultural Sites in Mali (Oct. 1, 2015), https://2009-2017.state.gov/r/pa/prs/ps/2015/10/247741.htm.

[11] Statement, Prosecutor of the ICC, On the Conclusion of the Preliminary Examination of the Situation in Palestine, and Seeking a Ruling on the Scope of the Court's Territorial Jurisdiction (Dec. 20, 2019), https://www.icc-cpi.int/Pages/item.aspx?name=20191220-otp-statement-palestine.

44.     In 2007, the OTP announced that it was conducting a preliminary examination of the situation in Afghanistan based on information available to the office without a referral from a State Party or the United Nations Security Council. On November 20, 2017, Ms. Bensouda requested authorization from the Pre-Trial Chamber under Article 15(3) of the Rome Statute to initiate a formal investigation into alleged war crimes and crimes against humanity (1) related to the armed conflict in Afghanistan and allegedly committed in Afghanistan since May 1, 2003, and (2) related to the armed conflict in Afghanistan and allegedly committed in the territory of other States Parties to the Rome Statute since July 1, 2002. The same day, Ms. Bensouda issued a public notice to victims of crimes within the scope of the requested Afghanistan investigation seeking their "representations" on whether the OTP should open an investigation.[12] Since then, the Victims Section has transmitted to the Pre-Trial Chamber a total of 699 victims' representations concerning Ms. Bensouda's request to open an investigation, with 680 of those representations supporting the request.[13]

45.     In her request to the Pre-Trial Chamber for authorization to initiate a formal investigation, the Prosecutor noted that the Taliban and affiliated groups were allegedly responsible for more than 17,000 civilian deaths since 2009.[14] She also noted that the Afghan National Security Forces were allegedly responsible for torture and other war crimes on a large-scale. The allegations against U.S. personnel focused on 78 cases of torture and other war crimes allegedly committed from 2003–04.

46.     On April 12, 2019, the Pre-Trial Chamber rejected Ms. Bensouda's Article 15 request for authorization of an investigation, finding that an investigation would not serve the interests of justice. But on March 5, 2020, the Appeals Chamber of the ICC reversed that ruling and unanimously authorized Ms. Bensouda to investigate alleged crimes relating to the situation in Afghanistan, including both crimes

---

[12] *Public Notice of the ICC Prosecutor*, Int'l Crim. Ct. (Nov. 20, 2017), https://www.icc-cpi.int/itemsDocuments/Afghanistan/171120-afgh-art_15-notice_ENG.PDF.

[13] Situation in the Islamic Republic of Afghanistan, ICC-02/17-29-AnxI-Red, Final Consolidated Registry Report on Victims' Representations Pursuant to the Pre-Trial Chamber's Order ICC-02/17-6 of 9 November 2017, Annex I, ¶¶ 16, 39 (Feb. 20, 2018), https://www.icc-cpi.int/RelatedRecords/CR2018_01452.PDF.

[14] Situation in Afghanistan, ICC-02/17-139, Summary of the Prosecutor's Request for Authorisation of an Investigation Pursuant to Article 15, (Nov. 20, 2017), https://www.icc-cpi.int/itemsDocuments/Afghanistan/171120-afgh-art_15-app-summ_ENG.pdf.

allegedly committed in Afghanistan and crimes that have a sufficient nexus to the armed conflict in Afghanistan and were allegedly committed in the territory of other States Parties. The investigation covers crimes allegedly committed by the Taliban and affiliated groups, the Afghan National Security Forces, and the U.S. military and Central Intelligence Agency (the "CIA").

47.     On April 15, 2020, Ms. Bensouda notified the Pre-Trial Chamber that the Government of Afghanistan had requested, under Article 18(2) of the Rome Statute, that the OTP defer its Afghanistan investigation pending Afghanistan's own investigations of "its nationals or others within its jurisdiction with respect to criminal acts allegedly committed within the authorised parameters of the Situation in Afghanistan, which may constitute crimes referred to in Article 5 of the Statute, and which relate to the information provided in your notification to States dated 12 March 2020." Due to the COVID-19 pandemic, the Prosecutor agreed to give Afghanistan until June 12, 2020 to provide supporting materials specifying the investigations that nation had conducted or was conducting, as required by Articles 18(2) and 53 of the Rome Statute. Ms. Bensouda also noted in this filing that due to the COVID-19 pandemic, the OTP was "not taking active investigative measures in relation to the scope of" Afghanistan's own investigations.[15]

48.     The Government of Afghanistan provided materials supporting its Article 18(2) request to the OTP on June 12, 2020. As of August 24, 2020, the OTP was "analysing the information provided by the Government of Afghanistan in support of its deferral request . . . and considering whether it has an impact on [the OTP's] own intended investigation." In addition, due to that ongoing analysis and the COVID-19 pandemic, the OTP stated it was "not currently taking active investigative steps while respecting its duties under the Statute."[16]

---

[15] Situation in the Islamic Republic of Afghanistan, ICC-02/17-139, Notification to the Pre-Trial Chamber of the Islamic Republic of Afghanistan's Letter Concerning Article 18(2) of the Statute, ¶¶ 1, 4–5 (Apr. 15, 2020), https://www.icc-cpi.int/CourtRecords/CR2020_01537.PDF.

[16] International Criminal Court, *Report of the International Criminal Court*, U.N. Doc. A/75/324, at 10 (Aug. 24, 2020), https://digitallibrary.un.org/record/3883407/files/A_75_324-EN.pdf.

## II. Plaintiffs and their Relationship to the Office of the Prosecutor

### A. Plaintiff Sadat

49. On December 12, 2012, Ms. Bensouda appointed Plaintiff Sadat as the Special Adviser on Crimes Against Humanity to the ICC Prosecutor.

50. Ms. Bensouda appointed Plaintiff Sadat pursuant to Article 42(9) of the Rome Statute, which provides that the Prosecutor "shall appoint advisers with legal expertise on specific issues, including, but not limited to, sexual and gender violence and violence against children." Under this provision, Special Advisers directly advise the Prosecutor on issues within the scope of their appointment. In a press release issued by the ICC announcing Plaintiff Sadat's appointment, the ICC stated that as Special Adviser on Crimes Against Humanity, Plaintiff Sadat "will help the OTP formulate office wide strategic policies relating to crimes against humanity."[17]

51. Plaintiff Sadat accepted her appointment as Special Adviser in her personal capacity, and not as a representative of her university or any other institution.

52. Both before and after her appointment as Special Adviser on Crimes Against Humanity, Plaintiff Sadat has conducted, at the OTP's request, "situation analyses" to determine whether communications to the OTP pursuant to Article 15 of the Rome Statute warrant the formal commencement of a preliminary examination. She has also regularly provided advice regarding legal issues involving ongoing cases and proceedings, provided input on OTP policy papers, conducted trainings for the OTP, and delivered lectures on legal issues of ongoing concern at the ICC.

53. Pursuant to Article 15, the OTP may receive information on alleged crimes from multiple sources. In order to distinguish those situations that warrant investigation from those that do not, the OTP has established a "filtering process" comprising four phases. In Phase 1, the OTP conducts an "initial assessment" of all information on alleged crimes received in an Article 15 communication "to analyse and

---

[17] Press Release, Int'l Crim. Ct., ICC Prosecutor Fatou Bensouda appoints Patricia Sellers, Leila Sadat and Diane Marie Amann as Special Advisers (Dec. 12, 2012), https://www.icc-cpi.int//Pages/item.aspx?name=pr861.

verify the seriousness of information received, filter out information on crimes that are outside the jurisdiction of the Court, and identify those that appear to fall within the jurisdiction of the Court."[18] Based on this initial assessment, the OTP may formally commence a preliminary examination of a given situation in Phase 2.

54.     In support of the OTP's initial assessment of Article 15 communications in Phase 1, Plaintiff Sadat reviews internal documents prepared by the OTP and researches and prepares formal legal memoranda for Ms. Bensouda and the OTP. These legal memoranda address whether a specific set of facts gives rise to a crime against humanity and the likelihood that the matter falls within the jurisdiction of the ICC. At the invitation of Ms. Bensouda, Plaintiff Sadat has periodically attended meetings of the OTP Executive Committee to discuss these situation analyses and other matters of concern to the ICC. The OTP Executive Committee is composed of the Prosecutor and the Directors of the three Divisions of the OTP, as well as other members of the OTP, and is responsible for advising the Prosecutor, providing strategic guidance on all activities of the OTP, and overseeing the development and adoption of the OTP's strategies, policies, and budget.

55.     As Special Adviser, Plaintiff Sadat also provides legal advice to OTP trial teams on questions relating to crimes against humanity, both remotely and in person at the OTP in The Hague, The Netherlands. These OTP trial teams work under the supervision of Ms. Bensouda. Plaintiff Sadat also advises on matters relating to appeals insofar as they relate to crimes against humanity.

56.     Since the spring of 2013, Plaintiff Sadat has taught an annual supervised research seminar at the Washington University in St. Louis School of Law entitled "Crimes Against Humanity Research Project." In the seminar, ten to twelve students supervised by Plaintiff Sadat conduct legal research and draft legal analyses to assist her in responding to specific research questions posed by the OTP to Plaintiff Sadat in her capacity as Special Adviser. When a seminar is in session, Plaintiff Sadat typically meets with students at least every other week and provides regular feedback on their research and memoranda

---

[18] Office of the Prosecutor, *Policy Paper on Preliminary Examinations*, Int'l Crim. Ct., ¶¶ 77–78, 80 (Nov. 2013), https://www.icc-cpi.int/iccdocs/otp/otp-policy_paper_preliminary_examinations_2013-eng.pdf.

on the "crimes against humanity" research topic. The seminar was most recently offered in the spring of 2019.

57.     In 2015, two of Plaintiff Sadat's students in the Crimes Against Humanity Research Project participated in six-month secondments at the OTP in The Hague. Under Plaintiff Sadat's supervision as Special Adviser, these students assisted the OTP with research projects related to crimes against humanity and other matters before the ICC.

58.     During her tenure as Special Adviser, Plaintiff Sadat has typically visited the ICC in The Hague each summer. During these visits, she participates in a wide variety of meetings with OTP staff including Ms. Bensouda, the OTP Executive Committee, trial teams, appeals teams, and the Jurisdiction, Complementarity and Cooperation Division. Plaintiff Sadat also conducts legal trainings on crimes against humanity for the OTP and other ICC personnel, gives public and private lectures, and gathers information relating to research projects that form the basis of the Crimes Against Humanity Research Project and her independent work. Plaintiff Sadat most recently visited the ICC in The Hague in December 2019.

59.     Due to the Executive Order and Designations, Plaintiff Sadat has felt obliged to sever her close working relationship with OTP staff, with whom she consulted frequently about her academic work as well as her work for the OTP. Plaintiff Sadat has also ceased communication with the ICC in connection with her legal work, abandoned plans to teach the Crimes Against Humanity Research Project in the fall of 2020 and spring of 2021, stopped preparing "situation analyses" for the OTP and giving advice regarding ongoing cases and proceedings, and abandoned plans to conduct remote legal trainings to the OTP and broader ICC personnel on crimes against humanity, because of her fear that these actions would subject her to penalties under IEEPA.

**B.     Plaintiff Koenig**

60.     Plaintiff Koenig has worked on issues related to the OTP and the ICC since the early 2010s, when she began researching the experiences of victims and witnesses participating in ICC proceedings. In 2012, she became the Interim Executive Director of the Human Rights Center at the University of California, Berkeley School of Law, becoming Executive Director on November 1, 2012. She has worked

with and advised the OTP in a number of capacities since that time. In addition to her work with the OTP, she has served since 2019 as a consultant to the Registry of the ICC on victim outreach issues.

61.     In 2012, Plaintiff Koenig coordinated with the Director of the OTP's Investigations Division, Michel de Smedt, who reports to Ms. Bensouda, and other OTP personnel to place a graduate student at the OTP. During this placement, this student identified issues in the OTP's preliminary examination, investigation, and prosecution processes that could be addressed through scientific and technology solutions. Following that placement, Plaintiff Koenig, along with other faculty from the Human Rights Center, met at The Hague with Mr. de Smedt and other OTP personnel to discuss the creation of a series of workshops bringing together the OTP and scientists, technologists, and human rights documenters to consider strategies to diversify the scientific and technological evidence that could be used to support OTP cases. Then, in 2014 and 2015, Plaintiff Koenig worked with Mr. de Smedt and others in the OTP to establish a technology advisory board. The OTP formalized its Technology Advisory Board (the "Board") in Terms of Reference signed by Mr. de Smedt in February 2016. Under the Terms of Reference, the Board's purpose is to "advise OTP on matters related to technological developments, by providing updates, insight, and guidance" on issues such as methodologies for online investigations, verification and analysis of potential evidence obtained from online sources, open-source documentation methods, and the incorporation of technology solutions into the OTP's practices and standard operating procedures.

62.     Plaintiff Koenig has served as co-chair of the Board since its inception. In this role, Plaintiff Koenig typically meets with Mr. de Smedt and other OTP personnel at The Hague and by telephone on an annual or biannual basis to discuss the challenges facing the OTP and how the Board could help resolve those challenges. Based on those discussions, Plaintiff Koenig crafts the Board's membership and priorities for the coming year. She also contributes to the Board's substantive work. Since its inception, the Board has transmitted to Mr. de Smedt and other OTP personnel a number of reports documenting the discussion during the Board's annual meeting and recommending technological solutions to various investigative and prosecutorial challenges facing the OTP. In 2020, Plaintiff Koenig and OTP personnel discussed expanding the Board's mandate to potentially serve other units within the ICC.

63.     In addition to supporting the OTP through the work of the Board, Plaintiff Koenig has conducted research at the OTP's request on technology and other issues related to the OTP's investigatory and prosecutorial work. Plaintiff Koenig has also communicated with OTP personnel on incorporating the Berkeley Protocol on Digital Open Source Investigations into the OTP's practices and standard operating procedures. This Protocol, published by the Human Rights Center and the United Nations Human Rights Office, articulates standards and guidelines for the "identification, collection, preservation, verification, and analysis of digital open source information" in international criminal and human rights investigations. In 2019, Plaintiff Koenig and OTP personnel discussed the possibility of the Human Rights Center performing digital fact-finding in support of specific OTP investigations.

64.     Since 2012 and most recently in the spring of 2020, Plaintiff Koenig has had numerous students and staff of the Human Rights Center conduct research for and/or participate in placements at the OTP in The Hague. Under Plaintiff Koenig's supervision, these students and staff have conducted research and/or advised on how digital fact-finding methods can strengthen the OTP's investigations and prosecutions. Before the issuance of the Executive Order, Plaintiff Koenig had planned to advise and co-supervise a Student-Initiated Legal Services Project that would have provided legal research and analysis to the OTP during the Fall 2020 and Spring 2021 semesters in support of the OTP's preparation for a trial regarding alleged war crimes and crimes against humanity.

65.     In recent years, Plaintiff Koenig has visited the ICC in The Hague approximately two times per year. During these visits, she meets with OTP personnel responsible for investigations and prosecutions to discuss challenges facing the OTP, to structure the work of the Board, to discuss implementation of the Berkeley Protocol, and to evaluate the OTP's need for research and other assistance from Plaintiff Koenig and her students and the Human Rights Center.

66.     Due to the Executive Order and Designations, Plaintiff Koenig has ceased her work with the Board for the OTP, halting progress on ongoing reports and ceasing discussions regarding expanding the work of the Board; ceased ongoing advising work and discussions regarding expanding the Human Rights Center's support of OTP investigations; stopped all work involving her students in support of the OTP, including the planned provision of pro bono legal services to the OTP under her co-supervision in

the fall of 2020 and spring of 2021; and cancelled plans to travel to The Hague in the fall of 2020 and spring of 2021 to meet with OTP personnel. She has ceased all of these activities because of her fear that these actions would subject her to penalties under IEEPA.

### C.     Plaintiff Roht-Arriaza

67.     Plaintiff Roht-Arriaza has worked on ICC-related issues since 1998, when the international community convened a diplomatic conference that resulted in the founding of the ICC. Since 2018, Plaintiff Roht-Arriaza has provided services to support the OTP's work on the situation in Venezuela.

68.     Plaintiff Roht-Arriaza is a leading proponent of an international human rights movement seeking accountability for high level officials' systemic and widespread "grand corruption" that results in or contributes to atrocity crimes.

69.     In 2018, Plaintiff Roht-Arriaza, alongside various Venezuelan civil society groups, began working on a campaign to use the mechanisms of international justice, including the ICC, to address the intersection of grand corruption and atrocity crimes. A key goal of this campaign has been to urge the OTP to address the role of grand corruption by state and illicit non-state actors in its preliminary examinations and investigations.

70.     In February 2018, the OTP announced it was conducting an Article 15 preliminary examination of the situation in Venezuela. Six States Parties—Argentina, Canada, Colombia, Chile, Paraguay, and Peru—further referred the situation to the Prosecutor in September 2018. The preliminary examination focuses on allegations that Venezuelan security forces used excessive force to suppress demonstrations and detained and abused thousands of actual or perceived opponents of Venezuelan President Nicolás Maduro. It also covers alleged violence by certain demonstrators against Venezuelan security forces.

71.     In June 2018, Plaintiff Roht-Arriaza participated in a series of meetings in The Hague with OTP personnel responsible for the preliminary examination into the situation in Venezuela, including Fabricio Guariglia, the Director of the OTP's Prosecutions Division, who reports to Ms. Bensouda. In these meetings, Plaintiff Roht-Arriaza urged the OTP to broaden the scope of the Venezuela preliminary examination to include the role of grand corruption in atrocity crimes committed in Venezuela. For

example, Plaintiff Roht-Arriaza urged the OTP to investigate patterns of murders tied to illicit mining and natural resources extraction operations benefitting both state and non-state actors in Venezuela.

72.     Plaintiff Roht-Arriaza planned to travel to The Hague in the summer of 2020 for additional meetings with OTP personnel on the status of the OTP's work on the situation in Venezuela and to educate the OTP about the relevance of grand corruption to the Venezuela preliminary examination. Related to this effort, Plaintiff Roht-Arriaza had also planned to continue communicating with the OTP and collaborating with civil society groups throughout Latin America to urge the OTP to incorporate a grand corruption lens in its preliminary examinations and investigations of situations in Latin America. Plaintiff Roht-Arriaza abandoned these plans, as well as plans for future advocacy, because of a fear that these actions would subject her to penalties under IEEPA in light of the Executive Order and Designations.

### D.    Plaintiff Watt

73.     Plaintiff Watt has worked as an attorney with the Human Rights Program at the ACLU since November 2004. Since October 2013 and until the issuance of the Executive Order, Plaintiff Watt and others he supervises provided services to support efforts by the ICC to investigate U.S. and other allied personnel allegedly involved in atrocity crimes.

74.      In October 2013, Emeric Rogier, Head of the Situation Analysis Section of the Jurisdiction, Complementarity and Cooperation Division of the OTP, contacted Plaintiff Watt regarding a petition that he had submitted to the Inter-American Commission on Human Rights in March 2012 on behalf of three men whom the U.S. military allegedly detained and tortured in Afghanistan in 2003. Plaintiff Watt subsequently provided Mr. Rogier and his staff with background information on the petition, the facts alleged in it, and evidence supporting allegations of war crimes committed by U.S. personnel in Afghanistan during the period relevant to the OTP's preliminary examination.

75.     In November 2015, members of the OTP team conducting the preliminary examination again contacted Plaintiff Watt regarding three clients he represented in U.S. federal court litigation concerning alleged war crimes committed by the CIA in Afghanistan during the period relevant to the OTP's preliminary examination.

76.     Over the course of several extended conversations, email exchanges, and telephonic meetings in the ensuing years, Plaintiff Watt provided the OTP's Afghanistan preliminary examination team with information regarding alleged war crimes and crimes against humanity committed by U.S. personnel against his clients in Afghanistan. In addition, Plaintiff Watt provided to OTP personnel documents obtained by the ACLU under the Freedom of Information Act and in U.S. federal court litigation, including litigation representing victims and survivors of alleged U.S. war crimes in Afghanistan. These documents substantiated U.S. policies and practices on the unlawful rendition, secret detention, and torture of foreign nationals in U.S. custody and control since September 11, 2001 in Afghanistan and elsewhere.[19]

77.     In January 2018, in support of Ms. Bensouda's Article 15 request to the Pre-Trial Chamber for authorization of an investigation into the situation in Afghanistan, Plaintiff Watt submitted victim representation forms to the Victims Section on behalf of six clients: Khaled El-Masri, Suleiman Abdullah Salim, Obaid Ullah (as personal representative of Gul Rahman), Mohamed Ahmed Ben Soud, Khaled Al-Sharif, and Majid Maghrebi.

78.     After submitting these representation forms on his clients' behalf, Plaintiff Watt continued to submit new documentary evidence of alleged U.S. war crimes and crimes against humanity in Afghanistan to the OTP via the Victims Section. Ms. Bensouda's request to the Pre-Trial Chamber for authorization of an investigation into the situation in Afghanistan specifically cited three ACLU cases, and evidence from one such case, in which Plaintiff Watt represented torture victims and survivors.[20] Plaintiff Watt provided information about, and supporting evidence from, these cases to the OTP.

79.     After the ICC's Appeals Chamber authorized Ms. Bensouda to open an investigation into alleged war crimes and crimes against humanity committed in Afghanistan or in connection with the armed conflict there, Plaintiff Watt applied for victim representative status to participate in investigation-

---

[19] Many of these documents can be found in a publicly available database maintained by the ACLU. *See The Torture Database*, ACLU, https://www.thetorturedatabase.org (last visited Jan. 14, 2021).

[20] *See* Situation in the Islamic Republic of Afghanistan, ICC-02/17-7-Red, Public redacted version of "Request for authorisation of an investigation pursuant to article 15", ¶ 233 & n.390, ¶ 327 & nn.546–48 (Nov. 20, 2017), https://www.icc-cpi.int/CourtRecords/CR2017_06891.PDF.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

stage proceedings on behalf of Mssrs. El-Masri, Salim, Obaid Ullah, Ben Soud, Al-Sharif, and Maghrebi. As of September 2020, Plaintiff Watt had submitted victim status forms for all six of these individuals to the Victims Section. The Victims Section granted three of these individuals—Mssrs. Salim, Ben Soud, and Al-Sharif—victim status for the investigation phase, with Plaintiff Watt as their legal representative. That same month, the Victims Section emailed Plaintiff Watt to inform him that it required additional information before it could grant his other clients victim status.

80.     Due to the Executive Order and Designations, however, Plaintiff Watt did not respond to the Victims Section's request for additional information about his clients because he feared that doing so would subject him to penalties under IEEPA. Due to the threat of such penalties, Plaintiff Watt also ceased all engagement with the OTP and other ICC personnel, abandoning plans to provide to the OTP additional documentary and other evidence of war crimes and crimes against humanity allegedly committed by U.S. personnel in Afghanistan; communicate with the OTP and, if necessary, file motions before the Pre-Trial Chamber to seek information from the Prosecutor on the Afghanistan investigation; and represent Mssrs. El-Masri, Salim, Obaid Ullah, Ben Soud, Al-Sharif, and Maghrebi for the duration of the ICC's Afghanistan proceedings.

## III.     The International Emergency Economic Powers Act

81.     IEEPA authorizes the President to declare a national emergency under the National Emergencies Act, 50 U.S.C. §§ 1601 *et seq.*, to "deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." *Id.* § 1701(a). After declaring an emergency, the President may:

> block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States.

*Id.* § 1702(a)(1)(B).

82.     Congress imposed certain restrictions on the President's authority under IEEPA. Among other limitations, IEEPA expressly denies the President "the authority to regulate or prohibit, directly or

indirectly . . . the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds." *Id.* § 1702(b)(3).

83.    Presidents have often exercised their IEEPA authority by issuing an executive order that declares a national emergency and "blocks" (that is, freezes) the property of persons designated either by the order or later by specific federal officials or agencies, such as the Department of the Treasury and the Department of State, to which the order delegates IEEPA authority. These orders block all of a designated person's property and property interests that are in the United States or in the possession or control of a U.S. person, which means that U.S. persons may not transfer or otherwise deal in such property.

84.    A typical executive order under IEEPA also prohibits U.S. persons from providing any "funds, goods, or services by, to, or for the benefit" of the designated persons. OFAC has historically interpreted this language broadly to prohibit nearly all interaction by U.S. persons with designated persons. For example, OFAC regulations implementing sanctions against North Korea clarify that U.S. persons may not provide "legal, accounting, financial, brokering, freight forwarding, transportation, public relations, or other services" that benefit sanctioned North Korean persons or entities. 31 C.F.R. § 510.405(d)(1).

85.    When the President or OFAC designates a person or entity for sanctions, OFAC adds that person or entity to its SDN List.

86.    IEEPA makes it unlawful for anyone "to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under" the statute. 50 U.S.C. § 1705(a). Violators are subject to a civil penalty equalling the greater of $307,922 or twice the value of the transaction giving rise to the violation. *See id.* § 1705(b); 31 C.F.R. § 520.701; 85 Fed. Reg. 19,884, 19,884 (Apr. 9, 2020). Anyone who wilfully violates an IEEPA order, attempts or conspires to do so, or aids and abets a violation faces criminal fines of up to $1,000,000 and up to twenty years in prison. 50 U.S.C. § 1705(c). The government has also prosecuted people for conspiracy to commit an offense

against the United States under 18 U.S.C. § 371 in connection with the planned violation of an IEEPA order.[21]

87.    OFAC is responsible for civil enforcement of IEEPA sanctions regimes. OFAC regularly imposes civil penalties on individuals and entities for violating such regimes.[22]

88.    The Department of Justice is responsible for enforcing criminal violations of U.S. sanctions regimes, and it has frequently prosecuted persons for such violations.[23]

89.    Thus, IEEPA orders trigger two distinct sets of consequences: (1) designation and (2) enforcement of civil and criminal penalties for violating an IEEPA order by dealing in blocked property or providing goods or services to or for the benefit of a designated person. The threat of such penalties deters individuals, financial institutions, and other businesses and entities from interacting with designated persons.

**IV.    The Executive Order and Implementing Regulations**

90.    On June 11, 2020, President Trump, invoking IEEPA, issued the Executive Order, and on September 30, 2020, OFAC issued the Regulations.

91.    In the Executive Order, the President asserted that "any attempt by the ICC to investigate, arrest, detain, or prosecute any United States personnel without the consent of the United States, or of personnel of countries that are United States allies and who are not parties to the Rome Statute or have not otherwise consented to ICC jurisdiction, constitutes an unusual and extraordinary threat to the national security and foreign policy of the United States" and "declar[ed] a national emergency to deal with that threat."

---

[21] *See, e.g.*, Press Release, U.S. Dep't of Justice, U.S. Att'y's Office, Dist. of N.J., Four Chinese Nationals and Chinese Company Indicted for Conspiracy To Defraud the United States and Evade Sanctions (July 23, 2019), https://www.justice.gov/usao-nj/pr/four-chinese-nationals-and-chinese-company-indicted-conspiracy-defraud-united-states-and.

[22] *See Civil Penalties and Enforcement Information*, U.S. Dep't. of the Treasury, https://www.treasury.gov/resource-center/sanctions/CivPen/Pages/civpen-index2.aspx (last visited Jan. 14, 2021).

[23] *See Summary of Major U.S. Export Enforcement, Economic Espionage, and Sanctions-Related Criminal Cases*, U.S. Dep't of Justice (Nov. 2019), https://www.justice.gov/nsd/page/file/1044446/download.

92.     Section 1(a)(i) of the Executive Order "block[s]" "[a]ll property and interests in property that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person" and which belong to any "foreign person determined by the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General":

> (A) to have directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute any United States personnel without the consent of the United States;
>
> (B) to have directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute any personnel of a country that is an ally of the United States without the consent of that country's government;
>
> (C) to have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, any activity described in subsection (a)(i)(A) or (a)(i)(B) of this section or any person whose property and interests in property are blocked pursuant to this order; or
>
> (D) to be owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly, any person whose property and interests in property are blocked pursuant to this order.

Exec. Order §§ 1(a)(i)(A)–(D). U.S. persons must "block" (that is, freeze) property under their control in which a designated person has a property interest and report such blocking to OFAC within 10 business days of the blocking. 31 C.F.R. § 501.603. Absent licensing by OFAC, blocked property and interests in property "may not be transferred, paid, exported, withdrawn, or otherwise dealt in." Exec. Order § 1(a). The Regulations prohibit the same transactions as the Executive Order. 31 C.F.R. § 520.201.

93.     Section 3 of the Executive Order provides that the prohibitions and property-blocking measures in section 1 "apply to the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to section 1(a) of this order." Exec. Order § 3(a). The Regulations broadly define "property and interests in property" to include, among other things, "services of any nature whatsoever." 31 C.F.R. § 520.310.

94.     Neither the Executive Order nor the Regulations state that the prohibitions do not apply to information or informational materials, which the President lacks authority to regulate "directly or

indirectly" under IEEPA. *See* 50 U.S.C. § 1702(b)(3). In regulations implementing other sanctions authorities, OFAC has interpreted this statutory limitation narrowly to apply only to information or informational materials fully created and in existence at the time of the transactions. *See, e.g.*, 31 C.F.R. § 569.205(b)(2).

95.     Neither the Executive Order, nor the Regulations, nor any relevant agency has defined which services are contributed or provided "to, or for the benefit of" a designated person as those terms are used in section 3 of the Executive Order. In particular, neither the Executive Order, nor the Regulations, nor any relevant agency has clarified which services provided to ICC personnel who are not designated under the Executive Order amount to services provided "to, or for the benefit of" ICC personnel that have been designated given their supervisory roles.

96.     However, in a September 2020 document answering "frequently asked questions" regarding analogous sanctions recently imposed on individual officials in the Government of the Hong Kong Special Administrative Region ("HKSAR"), OFAC warned that the consequences of those sanctions can apply very broadly. According to OFAC, "U.S. persons should be cautious in dealings with HKSAR government agencies in which an SDN is an official to ensure that they are not engaged in transactions or dealings, *directly or indirectly*, with an SDN (e.g., by entering into contracts that are signed by an SDN, entering into negotiations with an SDN, or processing transactions, directly or indirectly, on behalf of the SDN), absent authorization from OFAC or an applicable exemption."[24] This guidance concerned an executive order—issued less than one week after the Executive Order—that uses language identical to that of section 3(a) of the Executive Order.[25]

97.     Thus, section 3 of the Executive Order, particularly when read in light of this relevant OFAC guidance, appears to prohibit the work of advocates, legal representatives, translators, and others who provide investigatory, legal, or other services to any OTP personnel, including information and

---

[24] *Frequently Asked Questions: Hong Kong Related Sanctions*, U.S. Dep't of the Treasury (Sept. 25, 2020), https://home.treasury.gov/policy-issues/financial-sanctions/faqs/840 (emphasis added).

[25] *See* Exec. Order 13,936, *The President's Executive Order on Hong Kong Normalization*, 85 Fed. Reg. 43,413, 43,416, § 6(a) (July 17, 2020) ("The prohibitions in section 4(a) of this order include . . . the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to section 4(a) of this order . . . .").

information materials, because those services may be for the benefit of designated OTP personnel, even if they only "indirectly" involve designated personnel.

98.     Those who violate the Executive Order's prohibitions are subject to significant penalties as described in Paragraph 86, including a civil penalty equalling the greater of $307,922 or twice the value of the transaction giving rise to the violation and criminal penalties including a fine of up to $1,000,000 and up to twenty years in prison.

99.     On the day President Trump issued the Executive Order, then-Attorney General William Barr stated that the "Department of Justice fully supports these measures and will vigorously enforce the sanctions imposed today under the executive order to the fullest extent of the law."[26]

## V.     The Designations

100.     On September 2, 2020, Secretary Pompeo announced that "[p]ursuant to [the Executive Order], the United States is designating ICC Prosecutor Fatou Bensouda for having directly engaged in an effort to investigate U.S. personnel, and the ICC's Director of the Jurisdiction, Complementarity, and Cooperation Division Phakiso Mochochoko for having materially assisted Prosecutor Bensouda," and indicated that "[i]ndividuals and entities that continue to support Prosecutor Bensouda and Mr. Mochochoko materially risk exposure to sanctions" as well.[27] On that date, OFAC added Ms. Bensouda and Mr. Mochochoko to the SDN List.

101.     Under the Executive Order, Designations, and Regulations, a U.S. person or entity that makes "any contribution or provision of . . . services . . . to[] or for the benefit of" Ms. Bensouda or Mr. Mochochoko faces the threat of severe civil and criminal penalties. As a direct consequence of the executive actions, prohibited services include providing information or informational materials as well as *any* other service to Ms. Bensouda or Mr. Mochochoko or to other OTP or ICC personnel in circumstances

---

[26] Remarks to the Press, Att'y Gen., Secretary Michael R. Pompeo at a Press Availability with Secretary of Defense Mark Esper, Attorney General William Barr, and National Security Advisor Robert O'Brien (June 11, 2020), https://www.state.gov/secretary-michael-r-pompeo-at-a-press-availability-with-secretary-of-defense-mark-esper-attorney-general-william-barr-and-national-security-advisor-robert-obrien/.

[27] Press Statement, U.S. Dep't of State, Actions to Protect U.S. Personnel from Illegitimate Investigation by the International Criminal Court (Sept. 2, 2020), https://www.state.gov/actions-to-protect-u-s-personnel-from-illegitimate-investigation-by-the-international-criminal-court/.

where such services may be considered for the benefit of Ms. Bensouda or Mr. Mochochoko. These prohibitions apply even with respect to the provision of services unrelated to investigating, detaining, or prosecuting U.S. personnel or personnel of non-State Party U.S. allies.

102.    As discussed in Paragraphs 59, 66, 72, and 80, due to the threat of enforcement of civil and criminal penalties under IEEPA for violations of the prohibitions of the Executive Order and Regulations, Plaintiffs Sadat, Koenig, Roht-Arriaza, and Watt have ceased all meaningful engagement with the OTP. If the Executive Order, Designations, and Regulations were rescinded, or the enforcement of the Executive Order, Designations, and Regulations enjoined, Plaintiffs Sadat, Koenig, Roht-Arriaza, and Watt would immediately resume these activities.

## CAUSES OF ACTION

## CLAIM I

### Violation of the Free Speech Clause of the First Amendment to the U.S. Constitution

### *Against All Defendants*

103.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the claims below as though fully set forth in this claim.

104.    The Executive Order, Designations, and Regulations violate the First Amendment by prohibiting Plaintiffs from engaging in constitutionally protected speech under threat of civil and criminal penalties under IEEPA.

105.    The Executive Order, Designations, and Regulations operate as content-based restrictions on Plaintiffs' speech.

106.    The Executive Order, Designations, and Regulations have had a chilling effect on constitutionally protected speech. In particular, Plaintiff Sadat has ceased communicating with and providing legal advice to the OTP; has not taught her Crimes Against Humanity Research Project seminar; and has not conducted remote legal trainings for the OTP or other ICC personnel. Plaintiff Koenig has halted ongoing work with the Technical Advisory Board for the OTP; cancelled plans to meet with OTP personnel at The Hague in the fall of 2020 and spring of 2021; and abandoned plans to supervise students providing pro bono legal services to the OTP. Plaintiff Roht-Arriaza has abandoned plans to further

discuss the preliminary examination into the situation in Venezuela with OTP personnel, and to urge the OTP to incorporate grand corruption into its assessments of atrocity crimes. Plaintiff Watt has not responded to the Victims Section's request for additional information necessary to process applications for victim status recognition for his clients; has not provided to the OTP additional documentary and other evidence of war crimes and crimes against humanity allegedly committed by U.S. personnel in Afghanistan; and is no longer able to represent his clients with respect to the ICC's Afghanistan proceedings.

107.     The Executive Order, Designations, and Regulations are unconstitutional because they are not narrowly tailored to achieve a compelling governmental objective.

108.     The Executive Order, Designations, and Regulations are unconstitutionally overbroad.

**CLAIM II**

***Ultra Vires* Action in Violation of IEEPA, 50 U.S.C. §§ 1701-1706**

***Against All Defendants***

109.     Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the claims below as though fully set forth in this claim.

110.     The authority granted to the President under IEEPA does not include the authority to "regulate or prohibit, directly or indirectly," the import or export of "any information or informational materials." 50 U.S.C. § 1702(b)(3).

111.     Each of the Plaintiffs has previously engaged, and had planned to continue to engage, with Ms. Bensouda, Mr. Mochochoko, or other OTP personnel in a manner that involved the importation or exportation of information or informational materials. Such materials include but are not limited to the transfer of legal advice and memoranda, academic and scholarly articles, legal filings, and documentary and other evidence of war crimes and crimes against humanity.

112.     The Executive Order is *ultra vires* and otherwise unlawful because it regulates or prohibits, and authorizes Defendants to regulate or prohibit, acts that are exempt from regulation or prohibition under IEEPA, including the transmission of information and informational materials.

113.     The Regulations are *ultra vires* and otherwise unlawful because they regulate or prohibit acts that are exempt from regulation or prohibition under IEEPA, including the transmission of information and informational materials.

## CLAIM III

### Violation of the APA, 5 U.S.C. § 706

*Against Defendants Department of State, Pompeo, Department of the Treasury, Mnuchin, DOJ, Rosen, OFAC, and Gacki*

114.     Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint as though fully set forth in this claim.

115.     The Regulations regulate or prohibit acts that are exempt from regulation or prohibition under IEEPA, including the importation or exportation of information and informational materials. 50 U.S.C. § 1702(b)(3).

116.     The Regulations implementing the Executive Order therefore violate the APA because they are "not in accordance with law," 5 U.S.C. § 706(2)(A), and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.     Issue a declaratory judgment pursuant to 28 U.S.C. § 2201(a) declaring that the Executive Order, Designations, and Regulations violate the First Amendment to the United States Constitution;

B.     Issue a declaratory judgment pursuant to 28 U.S.C. § 2201(a) declaring that the Executive Order and Regulations are *ultra vires* under IEEPA and that the Regulations are in violation of the APA;

C.     Issue an order invalidating the Executive Order and preliminarily and permanently enjoining Defendants from implementing or enforcing the Executive Order;

D.     Issue an order vacating and setting aside the Regulations and Designations and preliminarily and permanently enjoining Defendants from implementing or enforcing the Regulations and Designations;

E.      Issue an order preliminarily and permanently enjoining Defendants from enforcing IEEPA's civil or criminal penalty provisions against Plaintiffs;

F.      Award Plaintiffs their costs and reasonable attorneys' fees incurred in this action; and

G.      Grant any other and further relief that this Court may deem just and proper.


DATED: January 15, 2021                          Respectfully submitted,


                                                 By:    /s/ Abigail P. Barnes

                                                 Abigail P. Barnes (Bar No. 313809)
                                                 COVINGTON & BURLING LLP
                                                 Salesforce Tower
                                                 415 Mission Street, Suite 5400
                                                 San Francisco, California 94105-2533
                                                 Telephone: +1 (415) 591-6000
                                                 Facsimile: +1 (415) 591-6091
                                                 Email: abarnes@cov.com

                                                 Trisha B. Anderson*
                                                 David M. Zionts*
                                                 Alexander N. Ely*
                                                 Diana Lee*
                                                 COVINGTON & BURLING LLP
                                                 One CityCenter
                                                 850 Tenth Street, NW
                                                 Washington, DC 20001-4956
                                                 Telephone: +1 (202) 662-6000
                                                 Facsimile: +1 (202) 662-6291
                                                 E-mail: tanderson@cov.com,
                                                 dzionts@cov.com, aely@cov.com,
                                                 dlee@cov.com

                                                 Scarlet Kim*
                                                 Dror Ladin*
                                                 Hina Shamsi*
                                                 AMERICAN CIVIL LIBERTIES UNION
                                                 FOUNDATION
                                                 125 Broad Street, 18th Floor
                                                 New York, NY 10004
                                                 Telephone: +1 (212) 549-2660
                                                 Email: scarletk@aclu.org, dladin@aclu.org,
                                                 hshamsi@aclu.org

                                                 *Application for admission pro hac vice
                                                 forthcoming

                                                 Attorneys for Plaintiffs

34